## AUGUSTUS v. NEW AMSTERDAM CASUALTY CO. OF BALTIMORE.

### No. 6621.

Circuit Court of Appeals, Seventh Circuit.

Dec. 15, 1938.

Rehearing Denied Jan. 17, 1939.

Harry Goodman and Joseph J. Augustus, both of Chicago, Ill., for appellant.

Louis L. Dent, George M. Weichelt, and John P. Hampton, all of Chicago, Ill., for appellee.

Before EVANS and MAJOR, Circuit Judges and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This action was brought against the surety on an administrator's bond to recover damages sustained by alleged breaches thereof. Upon trial before a jury, at the close of all the evidence, the court directed the jury to find the issues for the defendant. Upon the verdict, judgment was entered from which this appeal is taken.

Henry W. Magee died testate, a resident of Chicago, Illinois on August 16, 1931. His four children, Jerome P. Magee, Wayland W. Magee, Helen M. Marshall and the plaintiff, Louise M. Augustus, were, by the will, named executors thereof, and the testator's estate, after the payment of debts and funeral expenses, was bequeathed and devised in equal shares to said children. Decedent was the owner of an 800-acre farm located near the City of Omaha, Nebraska, and for the purpose of administration thereon, ancillary letters were issued by the County Court of the appropriate county, December 29, 1931, naming the four children as ancillary executors thereof. The farm, at that time, was equipped with livestock and farming machinery and had been managed by Wayland W. Magee on behalf of the decedent, for some twenty years.

On December 31, 1931, Wayland, after a conference with counsel representing all the executors, made an offer by letter in which he proposed to act for all the executors in the management of the farm and its operation for the year 1932, by which he was to continue the employment of the farm help, making such seasonable adjustments as to help and wages as might be proper under the circumstances. He proposed to keep the farm account in the First National Bank of Omaha with the privilege of borrowing up to $5,000 for

the purpose of carrying on such operations, and suggested as compensation for his services such amount as might be allowed by the County Court. Plaintiff, under date of January 15, 1932, replied to this offer, accepting the same with the reservation that she would not agree to be bound by the County Judge on the matter of compensation, suggesting that quarterly reports be made to her and requesting that her consent be obtained before loans were made. January 18, 1932, Wayland notified the plaintiff by letter of his acceptance of her suggestions. He also advised her that Jerome had turned down his offer and requested plaintiff to secure instructions from Helen. Shortly thereafter, plaintiff notified Wayland to the effect that his offer was agreeable to Helen.

Wayland managed and operated the farm until April 27, 1933. He rendered detailed quarterly reports, each of which was directed to Jerome, Helen and plaintiff, as executors of the estate, in compliance with the agreement theretofore made among the executors.

Some dispute having arisen as to the compensation to be received by Wayland for his services, plaintiff, on March 30, 1933, directed a letter to Harley G. Moorhead, the attorney for the executors, in which she claimed that Wayland, in the operation of the farm, was not acting for the executors, but for the heirs owning equal interests in common. She also, in this letter, stressed the importance of the operation of the farm for the succeeding year.

March 4, 1932, Jerome filed a petition in the County Court alleging inter alia that the farm was not and could not be rented for the coming season; that the executors could not agree as to the manner and method of conducting the affairs of the estate; that the best interests of the estate required the farm to be operated; and prayed that the executors be removed and an administrator appointed so that the farm could be in the custody of, operated by, cared for and preserved under the direction of the court. March 25, 1932, plaintiff and the remaining two co-executors filed their joint answer to Jerome's request for their removal. In the answer they admitted that the farm could not be rented for the coming season, but insisted the farm should be operated by the executors and that three of the executors had

agreed upon the manner and method of conducting the affairs of said estate by continuing Wayland, one of the executors, in charge of farming operations.

February 2, 1933, Wayland, as managing executor, filed in the County Court a report of his farming operations up to that time. A further petition was filed by Jerome on March 21, 1933, in which he again asked for the removal of the executors and assigned the additional reason that all of them had filed large claims against the estate which influenced them in the performance of their duties as executors, and again stressed the necessity that arrangements be made for the conduct of the farm during the following year. April 1, 1933, plaintiff, Wayland and Helen filed their application to appoint a manager for the year beginning March 1, 1933. They alleged that Wayland had managed the farm for twenty years; that the three applicants believed it for the best interest of the estate to continue him as manager; that an emergency existed on the farm; that planting was required; and that provision should be made for help, groceries, etc. The application concluded by requesting the appointment of Wayland as manager.

On April 3, 1933, there was entered in the County Court an order entitled, "Order for Operation of the 800-Acre Farm," in which it was recited that at a hearing at which all of the executors were represented by attorneys, no provisions having been made for looking after the farm and the necessary operations thereof, nor the livestock with its incidental expenses from March 1, 1933; that it was absolutely necessary that plowing, seeding, and caring for livestock be done at once; that it was essential that money be raised with which to pay for help and current bills; and that, pending the decision on the petition for removal of executors, the general operations of the farm must be carried on for the conservation and protection of the farm and livestock. The court ordered that, pending such decision, the executors were authorized and directed to operate the farm, commencing March 1, 1933, to pay expenses for help, groceries, supplies, taxes, etc., and to borrow money at the bank for that purpose; and authorized the executors to designate one of their number, or some one not of their number, to have immediate charge, under their general supervision.

April 26, 1933, an order was entered on the application of Jerome, filed March 21, 1933, finding that dissension existed among the executors and that, by reason of adverse claims against the estate and the removal of certain of the executors from the court's jurisdiction, it was to the best interest of said estate that all of the executors be discharged and appointing W. R. McFarland, administrator with the will annexed, upon his qualifying and filing bond in the sum of $10,000. This he did on April 27, 1933, with the defendant as surety. It is this bond which is sued on in the instant case.

Shortly after McFarland's appointment as administrator, he took charge of the farm, where he found a foreman and five employees, livestock and farming machinery. A portion of the livestock was ready for market and some of it required further feeding before it could be sold to advantage. He also found part of the farm in small grain seeded the fall before, and the corn ground plowed. This preparation for the farming season of 1933 had been made by Wayland as managing executor. Also, at the time of McFarland's appointment, none of the personal or real estate had been sold for the purpose of paying the debts and claims allowed or pending against the estate, and no steps had been taken to have the state inheritance tax determined or paid. An order was entered June 26, 1933, approving the final account of the executors who had theretofore been removed, and discharging them. Claims were approved against the estate in the amount of $22,847.55, and attorneys' and executors' fees allowed in the amount of $6,300. The administrator was ordered and directed to pay the same as soon as funds might be available for that purpose.

Harley G. Moorhead, prior to the appointment of McFarland, represented Wayland, Helen and plaintiff, as their attorney, and subsequently represented McFarland during the entire time concerned in the present litigation. We do not regard it as necessary to relate a detailed account of the administrator's farming operations. It is sufficient to state that it appears he managed and operated the farm as any other farmer would have done under the circumstances. His major activities were performed in conformity with orders duly entered by the County Court. Minor activities were taken care of under a general order which authorized the payment of small bills from a revolving fund of $200. The order authorized the drawing of checks against this fund with the approval of the defendant. When the administrator took charge, he had $19.91 in cash; the liquid assets of the estate were less than one-third of the liabilities; and at no time prior to final settlement did the administrator have from the income of the farm to exceed $2,000 which could have been used in the payment of claims. At various times he borrowed money from the bank and these loans and renewals totaled $7,150, the proceeds of which were used in payment of expenses incurred in the operation of the farm and to some extent applied upon the expenses of administration.

Included in the claims filed against the estate were two by Wayland, one for rent in the sum of $8,287.71 and one for services as managing executor in the sum of $3,000, allowed by the Court May 26, 1933 and June 27, 1933 respectively, claim of Helen in the sum of $2,618.94, claim of plaintiff in the sum of $2903.30, and claims of various attorneys in excess of $3,000 for services rendered in behalf of the executors while they were in control and managing the estate. All of these claims, allowed shortly after the administrator's appointment, were appealed to the District Court and from that court to the State Supreme Court. Some were finally allowed, others disallowed, and final order with reference to said claims was not entered in the County Court until October 25, 1935. This litigation was among the four heirs and neither the administrator nor his attorney took any part therein.

Harley G. Moorhead, the attorney for the administrator, testified that the prolonged administration of the estate was necessary because of the litigation concerning these claims since it was necessary for the administrator to know the total amount of claims against the estate before it could be determined what portion of the real estate should be sold.

The administrator filed in the County Court detailed annual reports of his operation of the farm. The first of these reports was filed May 5, 1934, the second June 3, 1935, the third May 18, 1936, and what purports to be a final account was filed on November 19, 1936, which last report included the previous annual reports and special reports theretofore filed. Included in the special reports was one

filed September 19, 1934, which had to do largely with the problems presented in the operation of the farm because of the serious drouth experienced during that season. In this report the administrator related his plans for conducting the farm during the following year, 1935. A copy of each of these reports was mailed by the administrator and received by each of the heirs, including plaintiff. Plaintiff did not make direct reply to any of these communications, but on May 26, 1936, in conjunction with her sister, Helen, filed in the County Court objections to the third and previous annual accounts, alleging in substance that the administrator was operating the farm without authority in the will, contrary to the statutes and without their consent, and that he should be held responsible for all losses.

February 18, 1935, Wayland proposed to the administrator that he would rent the farm for cash and purchase all personal property. Three days later the administrator wrote the plaintiff and other heirs, advising them of Wayland's offer, in which letter it was stated that most of the large claims against the estate were still in litigation and could not be paid until final determination, and asked their suggestions as to the advisability of accepting Wayland's offer. To this letter a reply was received from Helen to the effect that she was satisfied with the present plan of running the farm, which she thought was more advantageous than Wayland's proposition. Jerome replied, stating his opposition to the offer, and expressing the opinion that the farm was more salable as a going concern. The plaintiff made no response. January 6, 1936, the administrator, by correspondence with the plaintiff, agreed to purchase on behalf of the estate at the market price, her part of the corn raised that year, which offer was accepted by plaintiff.

October 25, 1935, at the time the final order was entered concerning the litigated claims against the estate, there was a conference among the attorneys for the various heirs in which it was agreed that an effort should be made to avoid a sale of the land by court action. Plaintiff denies that she was represented in that conference, although the record discloses that a Mr. Gaines, who had represented plaintiff during some phase of her litigation in the estate matter, was present. January 7, 1936, the administrator wrote a letter to Wayland's attorney, a copy of which was sent to attorneys for the other heirs, calling their attention to the conference of October 5, 1935, suggesting that if a plan could not be agreed upon, the administrator would proceed to sell the land to pay claims. The heirs having failed to agree upon such a plan, the administrator, on February 21, 1936, made application to the court for leave to sell realty; a decree was entered May 13, 1936; and the real estate sold on July 17, 1936, in separate parcels to the various heirs for sums aggregating $87,800. The various heirs were allowed credit on their bids to the extent of their respective claims as allowed, and their distributive shares, and the administrator received in cash $18,928.71.

Notice of the filing of the administrator's purported final account, November 19, 1936, was given by publication as provided by the state statute, and on January 14, 1937, after hearing, what is claimed to be a final decree in the matter was entered. Plaintiff filed no objection to the proceeding other than that which she therefore had filed to the third annual account as heretofore related, and took no part in said proceedings. Briefly, the decree found that the administrator had acted in conformity with the orders and instructions of the court concerning matters pertaining to the administration of the estate, found that all personal and real estate had been sold, allowed various items of administrative expense and court costs, and fixed the distributive share of each of the four heirs at $1562.48. The decree recited that a certain amount was due under the Agricultural Adjustment Act and certain other minor sums were due from various sources, all of which, when collected, would be paid to the heirs in equal amounts, and concluded that upon payment of the various items as determined, and the submission of vouchers showing such payments, the administrator, with approval by the court, be discharged. In compliance with said decree, the administrator, on April 7, 1937, submitted such receipts and vouchers as required by the decree of January 14, 1937. The order of April 7, 1937, found the administrator to have performed and discharged his duties and obligations in conformity with the orders of court and law, granted a final discharge and revoked his letters of administration. No appeal was taken from these orders and they have neither been modified nor altered.

February 16, 1937, the administrator notified plaintiff by letter that he was enclosing a check in the amount of $1,562.48 as her distributive share of the estate and as the amount due her under the final decree in settlement of the estate. Plaintiff signed and forwarded to the administrator a receipt for said sum in which it was recited that the same was in full and final settlement with said administrator and in full payment of the amount found to be due her according to the decree on final account dated January 14, 1937, and released the administrator and his bond from further liability in said matter. Subsequently, plaintiff received small amounts on two occasions as her share of items disclosed in the administrator's report of January 14, 1937, not then collected, and she receipted for the same.

The action of the District Court in directing a verdict in favor of the defendant is assigned as error. Defendant relies upon a number of propositions in support of the action of the court, among which are, first, that the decree of the county court, on the administrator's final account and its order discharging the administrator, was res judicata as to the issue presented; second, that the plaintiff was estopped as a matter of law from questioning the administrator's operation of the farm and administration of the estate; and third, that there was an accord and satisfaction between the administrator and the plaintiff which bars the instant action. Plaintiff contends that the administrator had only such power and authority as was conferred by the Statutes of the State of Nebraska and that contained in decedent's will, and that in neither is there to be found authority for the operation of the farm by the administrator, and that, consequently, the court was without power to enter the numerous orders pertaining thereto. It is pointed out specifically that the employment of the assets of the estate in the business of farming, the borrowing of money and negotiations of loans, the failure to pay claims and costs in apt time, the failure to close the estate as provided by statute, and various other acts, were in violation of the statute and void. Various sections of the Nebraska Statute are called to our attention defining and limiting the rights and duties of an administrator. In view of the conclusion we have reached, it is not necessary for us to analyze these numerous provisions and determine to what extent, if any, the acts of the administrator were unauthorized. There being no necessity, it would serve no useful purpose for us to do so.

Whatever we might determine in this respect, we are convinced that the plaintiff is estopped from asserting her claim and that the action of the court below must be sustained. We reach this conclusion not unmindful of the fact that courts have applied this rule with some hesitancy. The facts and circumstances, however, are convincing that the farm was operated, not only with complete knowledge by the plaintiff, but with her implied, if not actual, consent.

The general situation presented by this record is one of which there were many throughout the farming area beginning in 1931. Here, the executors, including the plaintiff, undoubtedly were presented with a troublesome proposition:—an 800-acre farm, completely equipped, which could not be sold except at great sacrifice to all concerned. They did the natural thing and the same as was done by thousands of farmers in their endeavor to postpone a sale, hoping for a better day. They undertook to, and did through one of their number as manager, operate the farm for some fifteen months. The plaintiff did not question the wisdom of this course, but participated therein. Friction developed among the executors and they disagreed as to the manner in which the farm should be operated. Jerome requested that the executors be discharged and that the farm be operated under an administrator to be appointed by the court. On March 25, 1932, the plaintiff and others, in a petition filed in court, conceded that the farm could not be rented for the following year, but insisted that the farm should be operated by the executors, and on April 1, 1933, filed their application for authority to appoint a manager beginning March first of that year. So it is certain that as late as that time, all of the executors, including the plaintiff, realized that the farm could not be rented and had no thought of undertaking a sale under the circumstances then presented. If plaintiff's request had been granted, the farm would have been operated until at least March 1, 1934. It is also certain from her petitions in court that she desired the farm operated along lines similar to that which had been employed during the testator's lifetime. Because of the dissension which existed among the heirs, the court concluded that it was for the best interests of

the estate that they be removed and an administrator appointed. An order was entered to this effect, and although plaintiff at that time was represented in court, no objection was made so far as the record discloses.

Plaintiff argues that the court erred in admitting evidence as to what occurred prior to the time of the administrator's appointment. We are not impressed with this argument. On the other hand, we thing it is quite material. It discloses that the court and the administrator continued a course which was begun by the executors and did so, not only with their consent, but at their request. They "blazed a trial" which the administrator followed. It appears that the administration was not as frugal as it might have been. For instance, we see no reason why he should not have paid at least some of the claims against the estate earlier than he did and thus save on interest, but it must not be overlooked that some of these claims, in large amounts, were allowed during the time plaintiff and her co-executors were in charge, and apparently no effort was made to pay them. It also must be remembered that litigation took place concerning a number of the claims involved, which was not finally determined until rather late in the affairs of the estate. He was not responsible for this litigation—it was a matter among the heirs—and it is difficult to see how the administrator could have proceeded in the settlement of the estate until this litigation was concluded. Evidently the administration was prolonged to some extent with the hope indulged in by all of the heirs, as well as the administrator, his attorney and the court, that some way could be worked out by which the claims might be paid and the estate settled without a sale of the farm. At least one conference was held in which the matter was discussed and tentative plans made. Whatever may be said of any dereliction or lack of authority charged to the administrator, we are convinced from the record he acted in good faith.

After insistence by plaintiff and others, in the spring of 1933, that the farm be operated, the administrator, under the guidance and direction of the court, took charge. At the end of each year thereafter, he filed a report, a copy of which was sent to plaintiff. These reports disclosed in minute detail all that was done in connection with the farming activities.

Plaintiff thus had knowledge that the farm was to be operated when the administrator took charge and at the end of each year received detailed information concerning its operation.

Early in 1935, Wayland's offer to purchase the personal property and rent the farm was communicated by the administrator to Jerome, Helen and plaintiff. The first two replied to the effect that they were opposed to the proposal and that the operation of the farm should be continued. Plaintiff remained silent, when, if she were opposed, it was her plain duty to speak. In view of what had transpired theretofore in the affairs of the estate, we think the administrator was justified in concluding that all of the heirs, including plaintiff, were agreeable to a continuation of the farming operations. As to two he had actual consent, and as to plaintiff, her consent was clearly implied. It was not until May, 1936, so far as we are able to ascertain from this record, that any question was raised by her as to the administrator's authority to operate the farm, and it was only then that any pretense was made that it was being operated without her consent. After that, and in the early part of 1936, correspondence was exchanged between the administrator and plaintiff with reference to her portion of the corn produced upon said farm, which resulted in its sale to the administrator. She was thus apparently willing to accept the fruits of the alleged illegal operation of the farm while contending that the administrator should be charged with losses.

Among the cases relied upon by plaintiff in support of her argument against estoppel is that of White v. Sherman, 168 Ill. 589, 48 N.E. 128, 61 Am.St.Rep. 132. True, the general rule as announced therein is favorable to plaintiff, but the exception is also stated and, in our opinion, the facts and circumstances before us bring plaintiff squarely within the exception. The court, on page 605, 48 N.E. on page 132 said: "Even though a trustee may have acted with the best intention, yet, if the trust estate has been wasted by his own breach of trust, there can be no question as to his liability, unless the beneficiary sanctions or acquiesces in the wrong, with full knowledge of the facts or of his rights in the premises. In order to bind a cestui que trust by acquiescence in a breach of trust by the trustee, it must appear that the cestui que trust knew all the facts, and was apprised of his legal

rights, and was under no disability to assert them. Such proof must be full and satisfactory. The cestui que trust must be shown, in such case, to have acted freely, deliberately, and advisedly, with the intention of confirming a transaction which he knew, or might or ought, with reasonable or proper diligence, to have known, to be impeachable. His acquiescence amounts to nothing if his right to impeach is concealed from him, or if a free disclosure is not made to him of every circumstance which it is material for him to know."

The law concerning estoppel has been stated by courts and text writers in language not altogether harmonious, resulting in some confusion. We think, however, the court in Leather Manufacturers' Nat. Bank v. Morgan, 117 U.S. 96, 6 S.Ct. 657, 29 L.Ed. 811, using the language of Lord Campbell in Cairncross v. Lorimer, 3 Macq. 827, approves an apt statement of the rule. The quotation, page 113, 6 S.Ct. page 663, is: "* * * If a party has an interest to prevent an act being done, has full notice of its having been done, and acquiesces in it, so as to induce a reasonable belief that he consents to it, and the position of others is altered by their giving credit to his sincerity, he has no more right to challenge the act to their prejudice than he would have had if it had been done by his previous license."

In Re Ennis' Estate, 96 Wash. 352, 165 P. 119, is a case where the court had before it a situation similar in many respects to that here presented. The court determined that the heirs and general creditors of an estate consenting that the business be carried on by the administrator were estopped to deny the claims of trade creditors. The merchandise business of the deceased was carried on by the administrator for some two years. The court found it was with the consent of the heirs

and general creditors, and on page 124 of 165 P. said: "During this time, while acting under the order of the court as granted to the administratrix, the indebtedness for new goods here in question was incurred. The administratrix and the heirs claim that they had not authorized the purchase of fresh stock and did not know it was done, but we think their participation in the affairs of the estate was sufficient to charge them with notice, whether they had actual notice or not."

In Hicks v. Purvis, 208 N.C. 657, 182 S.E. 151, is another case of similar nature. There the suit was brought against an administrator and the bonding company for damages resulting in the unauthorized operation of decedent's business for a period of some three years. On page 152 of 182 S.E., the court said: "With respect to plaintiffs' appeal, it is sufficient to say that the continued operation of decedent's nursery business was carried on with the full knowledge and apparent consent of all concerned, creditors and beneficiaries, including the plaintiffs. The referee, therefore, concluded, upon such finding, 'that the plaintiffs having permitted the defendant administratrix to continue the business of decedent for a period of more than three years with their knowledge, acquiescence and consent may not now charge the administratrix with losses arising from the continuation of such business.' This was approved by the judge upon exception to the report of the referee."

Other pertinent cases are found in the footnote.[1]

We therefore conclude that the defense of estoppel was properly invoked against plaintiff. Having thus concluded, there is no reason for us to consider or discuss other defenses.

The judgment of the court below is affirmed.

[1] In re Steeby's Estate, 143 Or. 501, 20 P.2d 1080, 1083; In re Jennings Estate, 74 Mont. 449, 241 P. 648, 654; Baxter et al. v. Jones et al., C.C., 185 F. 900; Steeby v. Norcott, 143 Or. 501, 20 P.2d 1080, 1083.