Argued September 16; reversed and remanded October 19, 1948

In re Estate of STEPHEN HEMSHORN, Deceased
LELEK *v*. HEMSHORN, Executor

198 P. (2d) 597

*Asa L. Lewelling,* of Salem, argued the cause and filed briefs for appellant.

*John H. Carson,* of Salem, and *W. Douglas Harris,* of Mt. Angel, argued the cause and filed a brief for respondent.

Before ROSSMAN, Chief Justice, and LUSK, BELT, KELLY, BAILEY, BRAND and HAY, Justices.

KELLY, J.

On December 8, 1940, Stephen Hemshorn died testate. By his will, he devised and bequeathed to his wife Elizabeth Hemshorn her dower interest in all of his real property, all of his household goods and personal effects that were not therein specifically bequeathed, and a certain one-acre tract described in Volume 110, Page 91 of the Deed Records of Marion County, Oregon.

To his son Werner Hemshorn he devised and bequeathed a tract of real property consisting of 1.25 acres and any unpaid balance on said son's promissory notes held by said testator over and above $3,000.

To his son Hugo Hemshorn he devised the south one-half of those tracts of land described in the deed

recorded in Volume 42, Page 535, Deed Records of Marion County, Oregon, being 106½ acres more or less; and he also bequeathed to said son Hugo all of his right, title and interest in and to all tools, implements, machinery, apparatus and appliances upon or used in connection with the testator's farming operations.

To his son, Arthur Hemshorn he devised 51 acres, more or less, in the N.W. ¼ of the S. E. ¼ of Section 33, Township 5 South Range 1 West of the Willamette Meridian in Marion County, Oregon.

To his daughter Wilhelmina Hemshorn he devised a tract of land described in a deed recorded in Volume 128 on Page 566, of said Marion County Deed Records, and also 20 acres off of the east end of the north half of the land described in Volume 42 at Page 535 of said Deed Records of Marion County, Oregon.

To his daughter, Alphonsine Lelek, the appellant herein, he devised approximately 43.25 acres off the west end of the north half of land described in said Volume 42 of Marion County Deed Records at page 535 thereof.

To his daughter Eugenia Pevelak he devised approximately 43.25 acres of the north half of land described on page 535 of said Volume 42 of said Deed Records.

He also bequeathed one dollar to Joseph M. Griesenauer and $500 to Father Alcuin, pastor of Mt. Angel parish.

The eleventh paragraph of his will is as follows:

"Eleventh

All the rest, residue and remainder of my estate, real, personal and mixed, of whatever kind the same

may be or wherever situated, I give, devise and bequeath to my six children, to be divided among them equally, share and share alike.''

The last provision of said will is as follows:

''Lastly, I nominate, constitute and appoint my son, Hugo Hemshorn, Executor of this my Last Will and Testament, and it is my desire and I do direct that no bond or undertaking whatsoever shall be required of my said Executor.''

On December 20, 1940, Hugo Hemshorn was appointed by the probate court of Marion County, Oregon, as executor of said last will and testament.

Immediately following his appointment, the executor caused a notice to creditors to be published once a week for four consecutive weeks commencing on December 26, 1940, and ending on January 23, 1941.

On January 21, 1941, an inventory and appraisement of said estate was filed.

He also decided to operate the farm as the most feasible way to defray the indebtedness, which he did until objections were made to his final account as such executor.

On July 7, 1941, said executor filed his first semiannual account, which on said date was approved by the judge of the probate department of the Circuit Court for Marion County, Oregon.

On January 22, 1942, said executor tendered his second semiannual account for filing, the final paragraph of which is as follows:

''That there are other unpaid claims against the estate, and certain unpaid administrations expenses of the estate, so that the property is not in condition to be distributed to the persons thereunto

entitled, and it is necessary to keep the estate open until such time as these matters are settled."

On the 22nd day of January, 1942, the judge of the probate department of the Circuit Court for Marion County, Oregon, ordered that said second semiannual account be filed and that the same be approved.

Seventeen objections were made to the final account filed on November 13, 1944. Originally, Mrs. Alphonsine Lelek and Mr. Arthur Hemshorn interposed said objections. Before the matter was presented to the trial court, a settlement was made with Mr. Hemshorn since which time Mrs. Lelek has been the only objector.

During the hearing of the original objections, notice was given that the executor desired to file a supplemental account, and permission to do so was granted by the trial court and a supplemental account was filed. Thereafter a second supplemental account was filed by the executor.

This appeal is prosecuted by Mrs. Lelek and eleven assignments of error are urged by her.

Her first assignment is employed as the basis for presenting that which her counsel terms the primary question, namely, the liability of an executor for continuing the business of a testator without authority from the will, the probate court or the interested devisees. This assignment is as follows:

"Assignment of Error No. 1

The lower court erred in failing to surcharge the executor's final account with the net profit made by said executor in continuing to operate the testator's farming business after testator's death and without either court authority, authority in the will, or permission of the devisees and legatees."

While included in those whose permission is said in this assignment of error to have been withheld from the executor to operate the business of testator after testator's death are the devisees and legatees, the record does not tend to show that any of the devisees or legatees, except Mrs. Lelek and Mr. Arthur Hemshorn, ever withheld such consent or in any way objected to the course taken by the executor; and, as shown above, while the assignment of error recites that the executor continued to operate testator's farming business without court authority, the record discloses that on January 22, 1942, the probate department of the circuit court approved his account wherein it was stated that it was necessary to keep the estate open until certain unpaid claims against the estate and certain unpaid administrative expenses could be settled.

As stated, when the objections to the executor's final account were first heard by the trial court and ever since then, Mrs. Lelek was, has been, and is, the only interested party withholding such consent. With respect to the merit or lack of it in appellant's first assignment of error, the question arises whether there was implied consent given by Mrs. Lelek to the course thus shown to have been taken by the executor. Stated differently, the question of estoppel by acquiescence is presented. Certain it is that from the time Hugo Hemshorn was appointed executor and undertook the task of carrying on the operation of their deceased father's dairy farm up and until the final account of Hugo Hemshorn, as executor, was filed, no objection was interposed by Mrs. Lelek or any one else to the course so taken by her brother Hugo. She testified that at one time in 1944, she asked Mr. Harris who was and

is one of the attorneys for the executor, what she could do to cause Hugo to file his reports as executor. She also testified Mr. Harris then told her that she could not do anything because Hugo had not given any bond.

Mr. Harris testified that sometime, probably in July, 1944, Mrs. Lelek and her husband came to his office and asked what authority the executor had for purchasing a panel delivery and a combine. He told her that he had no personal knowledge of it and that she should consult another attorney. Mr. Harris' version is so clearly the natural and logical one that the trial court did not err by believing it.

On the other hand, it is admitted by Mr. Lelek and affirmatively stated by the executor that sometime in the fall of 1942 when Mrs. Lelek and her husband Mr. Lelek were both in the presence of the executor, one of them told the executor that they would have to borrow some money to pick their hops.

It is true that Mr. Lelek testified that he was merely joking when he made that request. We quote from Mr. Lelek's testimony concerning that incident:

"Q. You were present during the time that Hugo Hemshorn, your brother-in-law, testified within the last few minutes.

A. I was.

Q. And did—you heard his testimony in relation to supposed conversation with your wife about borrowing money to pick hops?

A. I did.

Q. Were you ever present when any such conversation ever took place between he and your wife?

A. Yes, I was right in there.

Q. What was the conversation?

A. Well, the conversation was - - - - I was just trying to find out to see whether you could borrow money from the estate. That is all I wanted to do. Just kidding.

Q. Who had this conversation? You or your wife?

A. I did. I wanted to be sure whether he could borrow money from the estate fund.

Q. And did you ask him about that?

A. Well, I asked him, yes, for a loan.''

Referring to the same matter, Mrs. Lelek testified:

* * * ''money from the estate, but we certainly had no intention of borrowing money from the estate at any time or from any one else.''

It also appears that Mr. Lelek was employed by the executor to assist in carrying on some of the work of the dairy farm.

Voucher No. 388 discloses that on September 1, 1942, Mr. Lelek received for his labor $160.55 from the executor. Voucher No. 491 shows that on February 13, 1943, Mr. Lelek received for his labor $100.20 from the executor, and according to Voucher No. 751 on February 9, 1944, Mr. Lelek received for his labor $67.25 from the executor.

We feel warranted in holding that Mr. Lelek's course in performing such work and receiving his pay therefor was with the knowledge and approval of his wife the objector herein.

To recapitulate: Stephen Hemshorn died on December 8, 1940. On December 20, 1940, letters testamentary issued to Hugo Hemshorn as executor. On January 21, 1941, an inventory and appraisement was filed. On July 7, 1941, the executor's first semiannual account was filed. On January 22, 1942, the executor's

second semiannual account was filed. This account plainly disclosed to the probate court that the executor was conducting the business of dairy farming and thereby the executor apprised the probate court that there were unpaid claims against the estate and unpaid administrative espenses and, therefore, the property was not in a condition to be distributed, and that it was necessary to keep the estate open until such time as the matters were settled and the probate court approved this account.

Sometime in the fall of 1942, Mrs. Lelek and her husband had a conversation in which one of them asked the executor for a loan from the funds of the estate. Mr. Lelek was employed by the executor to assist in carrying on the business of decedent's dairy farm. On November 13, 1944, the executor's final account was filed whereupon for the first time Mrs. Lelek raised an objection to the executor's operation of said dairy farm.

We cannot agree with appellant's contention that the executor was without authority from the probate court or from the legatees, including the objector, to take the course he did, and most certainly the executor is shown to have had the affectionate confidence of his father when the will in suit was executed. Moreover, in the objector's first memorandum filed with the trial court after the second supplemental account of the executor had been filed, we find this statement:

"I am personally of the opinion that the executor, in the administration, although he acted erroneously and arbitrarily, did not proceed dishonestly, or with intent to cheat and defraud the other heirs."

The case of *In re S. Marks & Co.'s Estate,* 66 Or. 340, 133 P. 777, cited by appellant, is one wherein the

estate had been in the course of administration for 20 years. The delay was not occasioned by any order of the county court nor upon any good cause shown but by usurpation of authority to conduct a business for the heirs against their will and protest. Furthermore, the personal interests of the administrator were shown to have been so adverse to the interests of the estate and those entitled to its distribution that both could not be fairly represented by the same person. Clearly it cannot be said that the facts in that case are similar to those in the case at bar.

Appellant cites the case of *In re Jennings' Estate,* 74 Mont. 449, 241 P. 648. The facts in that case differ widely from those before us in the instant case. The following statement in the opinion distinguishes the Jennings case from the case at bar.

 * * "The administrator did not keep clear, distinct and accurate accounts of his management of the estate, as he should have done (24 C. J. 924); indeed, he did not keep any accounts at all."

The executor in the case at bar kept an account of every transaction and his books of account and vouchers for his expenditures are in the record. No good purpose can be served by further discussing the Jennings case.

The case of *Shea v. Graves,* 142 Or. 503, 19 P. 2d 406, also cited by appellant, calls attention to the general rule that an executor or administrator is not justified in placing the assets of the estate in trade; but it is there also stated that this general rule has its limitations and that good discretion may require some latitude in closing out decedent's business, "and this a probate court will duly consider" as was done by the probate court in the instant case when it approved the

executor's second semiannual report wherein it was stated that it was necessary to keep the estate open until certain unpaid bills and administrative expenses could be fully settled.

The statement in the case of *The Multorpor Co. v. Reed,* 122 Or. 605, 260 P. 203, also cited by appellant, to the effect that it is established in this state that the administratrix of an estate has no authority to carry on the business of the estate as a going concern has been modified in the case of *Shea v. Graves,* supra, and, therefore, except as so modified is not now controlling. This modification of the general rule is repeated in the case of *Steeby v. Norcott,* 143 Or. 501, 20 P. 2d 1080, also cited by appellant, where the authorities thereon are collated. This modification is expressed in the case of *Steeby v. Norcott,* supra, as follows:

> \* \* \* "Good discretion may require some latitude in closing out decedent's business, and this a probate court will duly consider. An executor or administrator may be justified in continuing the business so far as is necessary for the purpose of winding up the same and converting the assets into money or carrying out existing contracts of decedent under a proper order of the probate court." Citing authorities.
>
> \* \* "The consent of the persons interested in the decedent's estate to the action of the personal representative in continuing the decedent's business, as a rule, will relieve the executor or administrator from liability for losses resulting therefrom, although such personal representative did not inform the beneficiaries that the operations were not being conducted at a profit." Citing authorities.

While the record discloses that an interview was had by the appellant with the executor's attorney seeking a means of requiring the executor to file his reports,

it does not present any showing to the effect that appellant objected to the executor carrying on the business of decedent. In fact, it is conceded that appellant made no such objection until the executor had filed his final account.

> "As a general rule, where a person with actual or constructive knowledge of the facts induces another by his words or conduct to believe that he acquiesces in or ratifies a transaction, or that he will offer no opposition thereto, and that other, in reliance on such belief, alters his position, such person is estopped from repudiating the transaction to the other's prejudice. This rule obtains regardless of the particular intent of the party whose acquiescence induces action." 31 C.J.S. (Estoppel) pp. 362-363, Section 114, and authorities cited in notes 67 and 68.

The foregoing rule is discussed in an early Oregon decision, although, under the facts of that case, the rule could not be applied, because the defendant invoking the rule had not shown that the plaintiff had actual or constructive knowledge of the fact that the defendant had theretofore customarily taken the course upon which plaintiff's cause of action depended, and hence, it could not be said that plaintiff acquiesced in such a course. *McBee v. Ceasar,* 15 Or. 62, 13 P. 652.

■ In the case at bar, the evidence discloses that the appellant had actual knowledge that the executor was continuing the operation of decedent's dairy farming business, was incurring obligations, performing labor and marketing the products of such business over a period of years; and, despite such knowledge, the objector made no objection to the course so taken by the executor until the executor's final account had been filed.

For these reasons, we think the appellant's first assignment of error is without merit.

In thus applying the doctrine of estoppel by acquiescence to the facts of this case, we are not to be understood as approving the continued conduct and management by an executor or administrator of the business or enterprise formerly operated by the decedent without first securing an order of approval of such course by the probate court upon due and timely notice first given to the heirs, devisees, legatees and others interested in the affairs of the estate. By legislative enactment the time that may now be so approved by the probate court is limited to "a period not to exceed 12 months after the death of decedent." Oregon Laws 1943, Chapter 376, p. 515.

In the executor's first semiannual account, credit is claimed in the sum of $2,975.65 for disbursements attested by vouchers numbered 1 to 105 both inclusive, supplemented by seven additional vouchers, numbered from 1 to 7 both inclusive.

In said first semiannual account the executor reports receipts in the sum of $3,586.53 since the filing of the inventory and appraisement and the disposal of property of the estate appraised at $910.52 and of money deposited in the bank and listed in the inventory and appraisement in the sum of $307.97.

In his second semiannual account the executor claims credit in the sum of $3,179.77 supplemented by vouchers numbered from 106 to 234, both inclusive, and the further sum of $14.10 for which no voucher appears to have been presented.

In the executor's final account, he claims credit in the sum of $31,570.72 for disbursements supplemented by vouchers from 235 to 916, both inclusive.

In his final account, the executor also sets forth the receipts and additionals had since the filing of his second semiannual account.

■ With reference to appellant's second assignment of error to the effect that the probate court erred in failing to require the executor to bring into his final account those items reported in his semiannual accountings, it must be borne in mind that while such semiannual accounts are not conclusive, unless made so by statute, they are when approved as in the case at bar prima facie evidence of the correctness of the account stated and the burden of overcoming this presumption is on the party impeaching such settlement. 24 C. J., Subject, Executors and Administrators, pp. 1032, 1033, Section 2489, note 22, and cases there cited; 34 C. J. S., Subject, Executors and Administrators, p. 1112, Section 910, notes 55 and 56, and authorities there cited.

■ When a final account is being considered, the rule thus announced affords an objector an opportunity to put in issue the question of the accuracy and propriety of the contents in whole or in part of the semiannual accounts as well as those of the final account; and hence, no good purpose would be served in first requiring a reptition to be made in the final account of the contents of the semiannual accounts.

For this reason, we find appellant's assignment of error No. 2, to be untenable.

Assignment of error No. 3 is to the effect that the court erred in failing to surcharge the executor's account with the value of a Ford automobile listed in the inventory and not accounted for in the final account and improperly accounted for in the further supplemental account.

On September 10, 1945, appellant by her attorneys filed a memorandum brief with the clerk of the trial court, in which, *inter alia,* the following paragraph appears:

"Objection No. 2. This has to do with the Ford Coupe automobile appraised in the estate proceeding at $100.00. In paragraph II of the Further Supplemental Final Account this Ford car apparently was sold for charge to Elizabeth Hemshorn at that appraised value. We have no objection to the matter being handled in that way."

If the probate court understands the above quoted paragraph and concludes that the executor also understands it as the trial court does, there really is no issuable fact presented by appellant's assignment of error No. 3.

■ Thus far, we have determined the questions presented on this appeal; but as to the remaining issues, except as to assignment of error No. 11, we think that, before we pass thereon, the order of final settlement should contain an express determination thereof evidenced by affirmative findings by the probate court.

Assignments of error Nos. 4, 5, 6, 8, 9 and 10 are to the effect that the probate court erred in failing to surcharge the executor's account with the following items respectively, to-wit: (4) the amount of the two war bonds bought for the widow of the testator; (5) the sum of $100.00 paid Morris Fuchs as a real estate commission; (6) excessive advances to the widow of testator; (8) the value of improvements made on the executor's property and paid for with estate funds amounting to $542.54; (9) the amount paid for seed and labor applied to the executor's property and that of the widow and minor daughter of testator; and (10) the personal living expenses of executor.

Assignment No. 7 is to the effect that the probate court erred in failing to sustain appellant's objection to $5,000.00 additional compensation claimed by the executor and in failing to surcharge the executor with the amounts paid for farm machinery bought with estate funds.

Assignment No. 11 charges error upon the part of the probate court in failing to sustain appellant's objections to certain disbursements made from estate funds including $500.00 paid to Arthur Hemshorn as a compromise settlement of his objections to the executor's account.

■ In giving consideration to appellant's objection to the payment by the executor of $500.00 to Arthur Hemshorn as a compromise settlement of his objections to the executor's account, the objection of appellant appears to be meritorious for the reason that the objections thus attempted to be settled were made jointly and the mere withdrawal of Arthur Hemshorn's objection did not and could not accomplish a compromise settlement of the issues presented by the original objections for the reason that appellant still continues to urge those objections and has prosecuted this appeal from the action of the probate court in overruling them.

The fact that the probate court overruled appellant's objection to the course taken by the executor in paying to his brother Arthur $500.00 in order to effect a compromise with him of the issues presented by the objections interposed to the executor's final account would indicate that Arthur Hemshorn is thereby deemed to be entitled to $500.00 more than each of the other residuary distributees, which we think constitutes error.

■ A salutary rule is declared in a comparatively

recent decision by the Supreme Judicial Court of Maine to the effect that a probate court can distribute personal property of deceased persons only in accordance with legislative grant of authority even though beneficiaries agree otherwise. *Hutchins v. Hutchins*, 141 Me. 183, 41 Atl. 2d 612.

 We feel justified in adding that the order of the probate court to the effect that $500.00 should be paid to appellant evidently to equalize her receipts with those of her brother Arthur was unjustified and improper.

Paragraph VIII of the executor's final account is as follows:

"That the estate of Stephen Hemshorn, deceased, was at the time of his death heavily indebted, that the property consisted of a large farm stocked with machinery, equipment and livestock, and that in order to pay off the indebtedness with the least loss to the person interested in said estate, your executor acted in the capacity of manager and actually operated said farm since December 1940, and that a reasonable sum to be allowed the executor in this position would be the sum of $5,000.00 for the four year period, in addition to the sum of $905.44, executor's fees allowed by law; that during the course of managing said farm and properly carrying on the farming and dairy operations it was necessary for the executor to purchase certain machinery and other supplies out of the assets or income from the estate; that the sum or sums used for this purpose was not in excess of $5,000.00, and said executor is willing to accept the machinery purchased by him during his handling of said estate, as full and complete satisfaction for all services rendered both as executor and manager during the probate of said estate. That said executor feels that this is a reasonable sum to be allowed him for

services rendered and ask the court to approve said sum."

■ The decree of final settlement from which this appeal is taken does not expressly determine the amount to which the executor is entitled for his services as manager of the estate or as executor, nor does it direct which alternative should be acted upon in compensating the executor, that is, whether it should be in a definite sum of money, or the transfer and delivery to him of the machinery purchased by him with the funds of the estate as set forth in his final account.

The order of final settlement also fails to designate the respective amount, sum or specific thing that is due to each of the legatees, respectively.

"Since the order or decree of distribution is the judicial ascertainment of the right of the next of the kin or legatees to their respective shares in the estate under administration, and as such a conclusive judgment, it is obvious that it must set out the name of each person entitled, and also *the amount, sum, or specific thing due to each.*" (Italics supplied.) Vol. 3, Woerners, The American Law of Administration, 3rd Ed. p. 1911, Sec. 562, and authorities cited in note 2.

See *Gorg v. Rutherford,* 31 S. W. 2d 585; *Massie v. Paul,* 263 Ky. 183, 92 S. W. 2d 11; *Asher v. Bone,* 100 Fed. 2d 315.

We are not unmindful that the statutes of some states are more specific than ours expressly requiring the probate court in approving a final account or otherwise finally determining the issues, if any, arising upon it, to make an order of distribution to each heir or legatee respectively. For instance, the California

Probate Code in a few well chosen words expressly enjoins that duty upon the court thus:

> "At the time appointed, the court shall hear the petition and any objection thereto that may have been presented, and shall determine who are the heirs of the decedent or entitled to distribution of the estate and shall specify their interests." Section 1081, Probate Code of California.

In Oregon pursuant to legislative enactment in 1941, the jurisdiction of the county court of Marion County pertaining to a court of probate was vested in the circuit court of said county. Oregon Laws, 1941, Chapter 412, p. 701, et seq.

Such jurisdiction is expressly conferred by statute and includes jurisdiction: "To direct and control the conduct, and settle the accounts of executors, administrators and guardians"; "to direct the payment of debts and legacies, and the distribution of the estates of intestates;" Section 13-501, O.C.L.A., Vol. 2, p. 439.

Originally, the county court was given exclusive jurisdiction in the first instance pertaining to a court of probate.

The above quoted provision of said section 13-501 must be considered together with the provisions of section 19-1201, O. C. L. A. in determining the necessary provisions of an order of final settlement.

Said section 19-1201, not only requires the probate court when all the charges and claims have been settled to direct payment of legacies and the distribution of the remaining proceeds of the personal property among the heirs or other persons entitled thereto, but it also provides that if upon distribution, namely, the distri-

bution directed by the court any heirs or devisees, or other person, entitled to any of such proceeds shall fail to apply for his or her portion of said proceeds, for a period of three months after the making and entering an order of distribution by the court having probate jurisdiction of the estate, such court may, at any time thereafter upon a showing being made by the executor administrator, make an order directing the executor or administrator to pay the portion which such person is entitled to receive to the county treasurer of the county, who shall keep the same in a special fund, subject to the further order of said court.

If left to the discretion of the personal representative on final settlement to determine the respective amounts due respectively to each of the distributees the court would not have been summarily directed by statute thus to set apart a portion of the assets of the estate without first confirming and approving the distribution proposed by the personal representative.

For the error in overruling appellant's objection to the payment of $500.00 to Arthur Hemshorn and in failing to order and direct the executor to surcharge his account therewith the decree of final settlement of the probate court is reversed.

Moreover, the decree of distribution upon final settlement should affirmatively determine the amount to which the executor is entitled for his services as executor and also for his services in managing and conducting the business in which the testator was engaged before his demise.

The final decree of distribution should also determine whether such compensation should be paid in money or by the transfer to the executor of the machinery purchased by him with the funds of the estate.

The distributive share of the residue to which each distributee is entitled should be ascertained by the probate court and stated in the final order of distribution.

For these reasons, the decree of the probate court is reversed and the cause remanded for further proceedings not inconsistent herewith. The costs of this appeal should be borne by the estate.